UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

                                      Case No.: 2:23-cr-20626
                                      Hon. Gershwin A. Drain

ANDRES DAVID,

        Defendant.
_____/

**<u>OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT [ECF No. 27]</u>**

### I.    INTRODUCTION

On November 2, 2023, a grand jury indicted Defendant Andres David for being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). ECF No. 10. In addition, the indictment states that Defendant is subject to enhanced penalties under the Armed Career Criminal Act because he has at least three previous convictions for a violent felony or a serious drug offense. 18 U.S.C. § 924(e)(1).

On January 3, 2025, Defendant filed a Motion to Dismiss Indictment, which is presently before the Court. ECF No. 27. In the Motion, Defendant argues that pursuant to *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022),

1

the Government cannot demonstrate that 18 U.S.C. § 922(g)(1) is consistent with this Nation's historical tradition of firearm regulation, and it is therefore unconstitutional on its face and as applied to Defendant. ECF No. 27, PageID.91. The Government responded in opposition to the Motion. ECF No. 31. Defendant let his time to reply lapse. *See* E.D. Mich. L.R. 7.1(e)(2).

The Court finds that oral argument will not aid the disposition of this matter and will determine the outcome on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). The Court concludes that Defendant's Motion to Dismiss Indictment [ECF No. 27] shall be DENIED.

## II. BACKGROUND

On August 14, 2023, Detroit Police responded to a call about shots fired into a house occupied by two adults and four children. ECF No. 1, PageID.3. Police found four spent 9mm shell casings nearby. *Id.* A witness to the crime stated that the shooter looked like Defendant. *Id.* Defendant's cell phone location data showed that he was in the vicinity of the shooting around that approximate time, and license plate reader data placed Defendant's vehicle in the area, consistent with fleeing the scene and returning to his residence. *Id.* Later, Defendant admitted he was near the scene of the shooting, but alleged that he was not the shooter; rather, he was the one being shot at. *Id.* at PageID.4.

On September 13, 2023, Detroit Police officers conducted a traffic stop on Defendant while he was driving his vehicle. *Id.* at PageID.4. Officers discovered two spent 9mm shell casings on Defendant's windshield that preliminarily matched the casings recovered from the August 14 shooting. Thus, officers seized Defendant's phone and obtained a search warrant to look through it.

On Defendant's phone, police discovered a text conversation between Defendant and another individual. In the text exchange, Defendant sent the individual pictures of a revolver and ammunition, and agreed to sell the firearm to the individual. *Id.* at PageID.5–7. On the same date as the text exchange, Defendant's vehicle was parked on the street in front of the individual's house and Defendant's cell phone location data indicated he was in that vicinity as well. *Id.* at PageID.7. Thereafter, agents obtained a search warrant for the individual's residence and discovered a revolver and ammunition consistent with the photos Defendant sent to the individual over text, indicating that Defendant completed the sale to the individual. *Id.* at PageID.9.

Defendant has a lengthy criminal history preceding these events, spanning from 2002 to 2018. Defendant's convictions include two felony firearms offenses, two armed robberies, three second degree felony home invasions, felony larceny, a felony prisoner possessing weapons, and possession of a firearm by a felon. *Id.* at PageID.9–10.

Based on Defendant's alleged sale of the revolver and ammunition, a grand jury indicted Defendant for violating 18 U.S.C. § 922(g)(1), which prohibits a felon from possessing a firearm or ammunition. ECF No. 10. In addition, because Defendant has at least three previous convictions for a violent felony or serious drug offense, the indictment provides that Defendant is subject to enhanced penalties under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1).

Presently before the Court is Defendant's Motion to Dismiss Indictment. ECF No. 27. Defendant argues that under the framework provided in *Bruen*, § 922(g)(1) is unconstitutional on its face and as applied to him. *Id.* at PageID.91. First, Defendant alleges that the Second Amendment covers Defendant's possession of a gun because he is part of "the people" who have a "right… to keep and bear arms." *Id.* at PageID.91–92 (quoting U.S. Const. amend. II). As such, Defendant claims that it is the Government's burden to demonstrate that § 922(g)(1) is consistent with the Nation's historical tradition of firearm regulation. *Id.* at PageID.95. Defendant argues that it is not consistent with the Nation's tradition, so § 922(g)(1) is unconstitutional and the charges against Defendant must be dismissed.

The Government responded in opposition. ECF No. 31. First, the Government states that Defendant's motion is untimely. The Court's current Scheduling Order in this case set the dispositive motion deadline for December 6, 2024, but Defendant did not file his Motion until January 3, 2025 and did not ask for an extension of time

4

or give any explanation for the delay. *Id.* at PageID.117–18. Second, the Government argues that the issue of § 922(g)(1)'s facial constitutionality is foreclosed by *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024). Further, the Government contends that § 922(g)(1) is constitutional as applied to Defendant because Defendant is a "dangerous" individual under *Williams*'s framework. *Id.* at PageID.118–23.

### III. LAW & ANALYSIS

#### A. Legal Background

The Second Amendment of the United States Constitution states in its entirety: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This right is "among those fundamental rights necessary to our system of ordered liberty." *McDonald v. Chicago*, 561 U.S. 742, 778 (2010). The Supreme Court has held, for example, that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in the case of confrontation," and that the possession of handguns in the home was protected. *Dist. of Columbia v. Heller*, 554 U.S. 570, 592, 636 (2008). However, Second Amendment rights are "not unlimited," and governments are entitled to regulate firearms within constitutional bounds. *Id.* at 626.

In *Bruen*, the Supreme Court provided the two-part framework that courts use today to determine whether a firearm law is constitutional.[1] *Bruen*, 597 U.S. at 17. At step one, the court must determine whether the Second Amendment's plain text covers the conduct that the firearm law regulates. *Id.* at 24. If the Second Amendment's plain text covers that conduct, "the Constitution presumptively protects [it]." *Id.* The burden is then on the government to demonstrate that the law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* Notably, firearm regulations need not be "identical to ones that could be found in 1791." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Rather, modern laws regulating firearms must simply be "relevantly similar to laws that our tradition is understood to permit," and courts must apply the "balance struck by the founding generation to modern circumstances." *Id.* at 692, 698 (holding that an individual who

---

[1] Prior to *Bruen*, the Courts of Appeals "coalesced around a 'two-step' framework . . . that combine[d] history with means-end scrutiny" when determining whether a firearm regulation was constitutional. *Bruen*, 597 U.S. at 17. At step one, a court was required to determine whether the challenged law regulated activity that fell outside of the scope of the Second Amendment as it was originally understood. *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). If the activity was categorically unprotected, the analysis stopped there. *Id.* But if the activity was not categorically unprotected, step two required the court to inquire into "the strength of the government's justification for restricting or regulating the exercise of Second Amendment Rights"—in other words, determine whether the government's end justified the means. *Id.* (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)). In *Bruen*, the Supreme Court rejected the application of "means-end scrutiny" in Second Amendment analysis. *Bruen*, 597 U.S. at 19.

poses a credible threat to the physical safety of another may be disarmed under 18 U.S.C. § 922(g)(8)) (citation omitted).

The Sixth Circuit applied *Bruen* to determine the constitutionality of § 922(g)(1) in *United States v. Williams*. 113 F.4th 637 (6th Cir. 2024). As required by *Bruen*, the Sixth Circuit first inquired into whether the Second Amendment's plain text covers a felon's possession of a firearm. *Id.* at 648. It concluded that nothing in the Second Amendment's text "draws a distinction among the political community between felons and non-felons[,]" so a felon's possession of a firearm is presumptively protected. *Id.* at 649. As such, the court determined that § 922(g)(1) must be "consistent with the principles underpinning our historical tradition of regulating firearms" to be constitutional. *Id.* at 650.

To determine whether § 922(g)(1) is consistent with this Nation's historical tradition of firearms regulation, the Sixth Circuit then engaged in an exhaustive historical analysis spanning from the Middle Ages to colonial America. *See id.* at 650–57. It noted that there is a historical tradition of disarming "whole classes" of individuals that the government deemed "dangerous" for one reason or another. *Id.* at 657. However, individuals within a disarmed class were generally given a chance to "demonstrate that their particular possession of a weapon posed no danger to peace." *Id.* Therefore, the Sixth Circuit concluded that in the modern context "legislatures may disarm groups of people, like felons, whom the legislature believes

7

to be dangerous—so long as each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous." *Id.* at 663.

Applying this finding to § 922(g)(1), the Sixth Circuit held that the statute is facially constitutional because it is constitutional in "most applications"—where the felon-defendant is dangerous. *Id.* at 657; *see United States v. Salerno*, 481 U.S. 739, 745 (1987) (noting that to be facially unconstitutional, a statute must be unconstitutional in every circumstance in which it could be applied). However, it held that the statute is "susceptible to an as-applied challenge" where a felon is not dangerous, and that district judges serve the function of making the dangerousness determination. *Williams*, 113 F.4th at 657. The burden of demonstrating non-dangerousness rests on the defendant. *Id.* at 662.

As a guide to the district courts, the Sixth Circuit divided crimes into three categories. In the first category are crimes against the person, such as "murder, rape, assault, and robbery." *Id.* at 658. The court noted that a history of violent crimes like these are "strong evidence that an individual is dangerous." *Id.* In the second category are crimes that, "while not strictly crimes against the person, may nonetheless pose a significant threat of danger[,]" such as drug trafficking and burglary. *Id.* at 659. The court stated that convictions for these crimes will often "justify a finding of danger." *Id.* In the final category are "crimes [that] cause no

8

physical harm to another person or the community[,]" such as mail fraud and making false statements. *Id.* The court stated that these cases are "challenging," but that district courts will likely "have no trouble concluding that many of these crimes don't make a person dangerous." *Id.* The Sixth Circuit emphasized that courts need not make categorical determinations about dangerousness, but rather should make "fact-specific dangerousness determinations after taking account of the unique circumstances of the individual, including details of his specific conviction[,]" and evaluating the individual's "entire criminal record." *Id* at 663.

**B. Analysis**

i.  Untimeliness of Motion

The Government argues that Defendant's Motion should be denied because it is untimely. Dispositive motions were due by December 6, 2024, and Defendant filed his Motion to Dismiss nearly a month later, on January 3, 2025, without any explanation.

Under Federal Rule of Civil Procedure 16(b)(4), a scheduling order may be modified for good cause and with the judge's consent. Fed. R. Civ. P. 16(b)(4). "In order to demonstrate good cause, the [party requiring an extension] must show that the original deadline could not reasonably have been met despite due diligence and that the opposing party will not suffer prejudice by virtue of the amendment." *Ross v. Am. Red Cross*, 567 Fed. App'x 296, 306 (6th Cir. 2014) (citing *Leary v.*

9

*Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003)). In this case, Defendant "provides no explanation, much less good cause," as to why he filed his dispositive motion late. *Viking Energy of Traverse City, Ltd. v. Ryan Energy Tech. U.S.A., Inc.*, No. 5:04-CV-69, 2005 WL 8174445, at *1 (W.D. Mich. Sept. 16, 2005). The Court is within its discretion to deny the Motion on these grounds. However, the Court will address the merits of Defendant's argument.

ii. Constitutionality of § 922(g)(1)

a. *Facial Constitutionality*

Defendant first argues that § 922(g)(1) is facially unconstitutional. Defendant commits several pages of his brief to analyzing this issue, concluding that the Second Amendment covers his conduct and that § 922(g)(1) is not analogous to any historical regulations. However, Defendant fails to address *Williams*, which is binding precedent in this Circuit.

The *Williams* decision agrees with Defendant's contention that "the Second Amendment's plain text presumptively protects" a felon's right to keep and bear arms. *Williams*, 113 F.4th at 649. But the Sixth Circuit ultimately concluded that the government "may disarm individuals [it] believe[s] are dangerous," and that such regulations are consistent with the Nation's history and tradition of firearm regulations. *Id.* at 657. For a statute to be facially unconstitutional, there must be "no set of circumstances under which the Act would be valid." *Id.* (quoting *Salerno*,

10

481 U.S. at 745). Noting that "most applications of § 922(g)(1) are constitutional" under the historical standard laid out in its opinion, the Sixth Circuit concluded that § 922(g)(1) "is not susceptible to a facial challenge." *Id*. Thus, Defendant's facial unconstitutionality argument fails.

    b. *As-Applied Constitutionality*

Defendant next argues that § 922(g)(1) is unconstitutional as applied to him. Notably, however, Defendant does not make any argument under the *Williams* framework as to why the Court should find that he is not dangerous. Indeed, nearly the entirety of Defendant's brief is spent contesting the facial validity of § 922(g)(1), a position that has already been foreclosed by *Williams*. Defendant mentions the as-applied argument merely once, and in a conclusory manner. *See* ECF No. 27, PageID.91. Under *Williams*, a defendant bears the burden of demonstrating that he is not dangerous. *Williams*, 113 F.4th at 662. Defendant's failure to address this issue is fatal to his Motion.

Nevertheless, even if Defendant *had* offered any argument as to his non-dangerousness, Defendant's extensive criminal history would counsel against finding that he is non-dangerous.

Defendant has two prior convictions for armed robbery, which occurred in 2006 and 2010, respectively. ECF No. 1, PageID.9–10. The Government provided the details of Defendant's 2006 armed robbery conviction. *See* ECF No. 31-4. On

11

August 8, 2005, Defendant and a co-defendant had robbed a victim of his shoes at gunpoint. *Id.* at PageID.138. A few days later, on August 11, 2005, Defendant robbed another victim of his wallet, phone, and car stereo at gunpoint, with the victim's three-year-old daughter in the car. *Id.* at PageID.138–39. Thereafter, Defendant was arrested and pled guilty to both encounters. *Id.*

The *Williams* court noted that robbery was a crime against the person which "speak[s] directly to whether an individual is dangerous." *Williams*, 113 F.4th at 658. Indeed, the *Williams* court suggested that a history of committing crimes against the person—such as robbery—may even be *dispositive* as to an individual's dangerousness. *Id.* (discussing how crimes against the person were often punished with death at the Nation's founding, and that "the death penalty served to eliminate those too dangerous to have a place in society before the development of prisons."). *Williams* ultimately concluded that a history of violent crimes is "at least strong evidence" that an individual is dangerous, and the individual bears an "extremely heavy" burden to overcome this evidence. *Id.*

Given Defendant's criminal history of armed robbery, and Defendant's lack of argument as to why these crimes do not indicate his dangerousness, the Court concludes that Defendant's armed robbery convictions are probative of his dangerousness and that Congress may constitutionally disarm him for this reason. *See United States v. Fordham*, No. 24-1491, 2025 WL 318229, at \*5 (6th Cir. Jan.

12

28, 2025) (finding defendant's prior armed robbery conviction probative of dangerousness); *United States v. McQueen*, No. 24-20136, 2024 WL 3331629, at *6 (E.D. Mich. July 8, 2024) (noting that robbery involves force or violence, and that "[t]he founding generation undoubtedly would be surprised by a scheme that permitted convicted robbers—who would have been considered highly dangerous individuals—to retain their weapons.").

Moreover, Defendant's criminal history does not end with his armed robberies. Defendant has three second degree felony home invasion convictions from as recently as 2017. Michigan's second-degree felony home invasion statute corresponds with "generic burglary." *Malone v. United States*, 791 Fed. App'x 543, 546 (6th Cir. 2019). Burglary is considered "an inherently dangerous crime because [it] 'creates the possibility of a violent confrontation between the offender and an occupant, caretaker, or some other person who comes to investigate.'" *United States v. Stitt*, 586 U.S. 27, 34 (2018) (quoting *Taylor v. United States*, 495 U.S. 575, 588 (1990)). In *Williams*, the Sixth Circuit also noted this connection between burglary and the potential for violent confrontation, concluding that a criminal history of burglary "justif[ies] a finding" that a defendant is dangerous. *Williams*, 113 F.4th at 659. Defendant's home invasion convictions, therefore, also lead the Court to conclude that Defendant may be disarmed under § 922(g)(1).

13

In addition, the Sixth Circuit has stated that courts may look to the facts underlying the instant offense when determining dangerousness. *See Fordham,* 2025 WL 318229, at *5. Defendant was on parole at the time he possessed the firearm in this case. ECF No. 31, PageID.115; ECF No. 31-8, PageID.173. One of the conditions of Defendant's parole was that he could not use or possess any weapons whatsoever. ECF No. 31-8, PageID.174. The Sixth Circuit has specifically upheld a defendant's § 922(g)(1) conviction where the defendant had prior felony convictions and was prohibited from possessing firearms while on probation, noting that "our nation's historical tradition of forfeiture laws, which temporarily disarmed convicts while they completed their sentences, also supports disarming those on parole, probation, or supervised release." *United States v. Goins*, 118 F.4th 794, 801–02 (6th Cir. 2024). Similarly here, Defendant's parole conditions—and his violation of those conditions—only lend further support to the constitutionality of disarming him.

The Court also notes that Defendant has a felony firearm conviction for possessing a sawed-off shotgun, and a felony for possessing a weapon, specifically a shiv, in prison. ECF No. 31, PageID.121. "[I]rresponsible firearms behavior"—such as illegally possessing a sawed-off shotgun—"endangers the community at large and heightens the risk of violent confrontation." *United States v. Hines*, No. 3:22-cr-157, 2024 WL 4252569, at *5 (N.D. Ohio Sept. 12, 2024) (internal quotation marks omitted). This logic easily extends to possessing a weapon in prison, where

the potential for violence is great. Defendant's convictions for these crimes reinforce the Court's finding of dangerousness.

Considering the foregoing, for the purposes of the Second Amendment, Defendant is dangerous under the *Williams* framework and Congress may constitutionally disarm him under § 922(g)(1).[2]

### IV. CONCLUSION

Accordingly, Defendant's Motion to Dismiss Indictment [ECF No. 27] is **DENIED.**

**SO ORDERED.**

---

[2] The Government encourages the Court to consider Defendant's alleged involvement in the August 2023 shooting in determining Defendant's dangerousness, noting that the Sixth Circuit has stated that courts may consider the conduct underlying the offense at issue. ECF No. 31, PageID.122; *see Fordham*, 2025 WL 318229, at *5. Notably, however, Defendant's charge for possession of a firearm stems from his sale of the revolver and ammunition, not from the August 2023 shooting. Indeed, the Government admits that Defendant "is not currently charged with possessing a firearm or ammunition in connection with [the] August shooting[.]" ECF No. 31, PageID.114. With the Government's apparent hesitation to charge Defendant with possession of a firearm in relation to the shooting, the Court declines to consider these factual allegations against Defendant in determining Defendant's dangerousness.

The Government also contends that Defendant has a gang affiliation with the Latin Counts, which demonstrates Defendant's dangerousness. ECF No. 31, PageID.117. Although the Government states that this fact is reflected in one of its exhibits, none of the Government's exhibits actually mention gang affiliations. As such, the Court also declines to consider Defendant's alleged gang affiliation in determining Defendant's dangerousness. Defendant's criminal convictions alone are more than sufficient for a finding of dangerousness.

Dated: February 12, 2025

/s/Gershwin A. Drain
GERSHWIN A. DRAIN
United States District Judge

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on February 12, 2025, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager